FILED
21 SEP 22 PM 12: 05

U.S. DISTRICT COURT
MIDDLE DISTRICT OF TN

J.H. and M.H. minors, by and through their parent,
Megan Heim; L.M. and P.M. minors, by and
through their parent, Kristin McKinney; T.B a
minor, by and through her parent, Sharon
Blount; and B.H. by and through her parent
Connie Keffaber

      Plaintiffs,

       v.

WILLIAMSON COUNTY SCHOOL
BOARD OF EDUCATION; JASON A.
GOLDEN, in his individual capacity and in his
official capacity as Superintendent of the
Williamson County Schools; GARY
ANDERSON, in his individual capacity and in
his official capacity as Executive Director of
Health and Safety; and NANCY GARRETT,
K.C. HAUGH, JENNIFER APREA, SHEILA
CLEVELAND, CANDACE EMERSON, BRAD
FISCUS, ELIOT MITCHELL, ERIC WELCH,
RICK WIMBERLY and GARY ANDERSON,
all in their **individual** capacities and in their
capacities as members of the Williamson County
School Board of Education,

      Defendants.

**03-21  0733**

Civ. No. _____

## COMPLAINT

  Plaintiffs, J.H. and M.H. minors, by and through their parent, Megan Heim; Plaintiffs,

L.M. and P.M. minors, by and through their parent, Kristin McKinney; Plaintiff T.B a minor, by

and through her parent, Sharon Blount; and B.H. by and through her parent Connie Keffaber *pro*

*se*, hereby file this Complaint against Defendants, Williamson County School Board of

Education ("School Board"); Jason A. Golden, in his individual capacity and in his official

capacity as Superintendent of the Williamson County Schools; Gary Anderson, in his individual

1

capacity and in his official capacity as Executive Director of Health and Safety; and, Nancy Garrett, K.C. Haugh, Jennifer Aprea, Sheila Cleveland, Candace Emerson, Brad Fiscus, Eliot Mitchell, Eric Welch, and Rick Wimberly all individual elected officials sued in their individual capacity and in their capacity as members of the School Board (collectively, "Defendants"). In support of the claims set forth herein, Plaintiffs allege and aver as follows:

## PARTIES

1.  Plaintiffs J.H. and M.H. are minor children who reside in Williamson County School District ("WCSD"), in Williamson County, Tennessee. Plaintiffs J.H. and M.H. are and were at all times relevant hereto a student at a Williamson County Schools public school. Suit is brought herein on J.H. and M.H.'s behalf by their mother, Plaintiff Megan Heim.

2.  Plaintiff Megan Heim is an adult individual who is a resident and taxpayer in the Williamson County School District, in Williamson County, Tennessee. Plaintiff Megan Heim is the parent of Plaintiffs J.H. and M.H.

3.  Plaintiffs L.M. and P.M. are minor children who reside in Williamson County School District ("WCSD"), in Williamson County, Tennessee. Plaintiffs L.M. and P.M. are and were at all times relevant hereto a student at a Williamson County Schools public school. Suit is brought herein on L.M. and P.M.'s behalf by their mother, Plaintiff Kristin McKinney.

4.  Plaintiff Kristin McKinney is an adult individual who is a resident and taxpayer in the Williamson County Schools, in Williamson County, Tennessee. Plaintiff Kristin McKinney is the parent of Plaintiffs L.M. and P.M.

5.  Plaintiff T.B. is a minor child who resides in Williamson County School District ("WCSD"), in Williamson County, Tennessee. Plaintiff T.B. is and was at all times relevant

2

hereto a student at a Williamson County Schools public school. Suit is brought herein on T.B's behalf by their mother, Plaintiff Sharon Blount.

6. Plaintiff Sharon Blount is an adult individual who is a resident and taxpayer in the Williamson County School District, in Williamson County, Tennessee. Plaintiff Sharon Blount is the parent of Plaintiff T.B.

7. Plaintiff B.H. is a minor child who resides in Williamson County School District ("WCSD"), in Williamson County, Tennessee. Plaintiff B.H. is and was at all times relevant hereto a student at a Williamson County Schools public school. Suit is brought herein on B.H.'s behalf by their mother, Plaintiff Connie Keffaber. ·

8. Plaintiff Connie Keffaber is an adult individual who is a resident and taxpayer in the Williamson County School District, in Williamson County, Tennessee. Plaintiff Connie Keffaber is the parent of Plaintiff B.H.

9. Defendant Williamson County School District Board of Education (the "School Board" or the "Board") is a public entity which, acting under color of law, is responsible for the formulation and implementation of all official governmental laws, policies, regulations and procedures in effect for the Williamson County Schools. 1320 West Main Street Franklin, TN 37064 (615) 472-4000

10. Defendant Jason Golden was at all relevant times the Superintendent of the Williamson County Schools; in that capacity, acting under color of law, he is responsible for the implementation of all official governmental laws, policies, regulations and procedures governing the Williamson County Schools. He is sued in his official and individual capacities. jasong@wcs.edu.

11. Defendant Gary Anderson is a Williamson County resident, former member of the School Board and hired in September 2020 as Executive Director of Covid Response for

3

Williamson County Schools, sued here in his individual and representative capacity. Gary.anderson@wcs.edu.

12.     Defendant Nancy Garrett is a Williamson County resident and member of the School Board, sued here in her individual and representative capacity. Ms. Garrett is currently the Chairman of the School Board. Nancy.garrett@wcs.edu

13.     Defendant K.C. Haugh, is a Williamson County resident and member of the School Board, sued here in her individual and representative capacity.  Mr. Haugh is currently the Vice Chairman of the School Board. Kc.haugh@wcs.edu

14.     Defendant Jennifer Aprea is a Williamson County resident and member of the School Board, sued here in her individual and representative capacity. Jennifer.aprea@wcs.edu

15.     Defendant Sheila Cleveland is a Williamson County resident and member of the School Board, sued here in her individual and representative capacity. Sheila.cleveland@wcs.edu.

16.     Defendant Candace Emerson is a Williamson County resident and member of the School Board, sued here in her individual and representative capacity. Candace.emerson@wcs.edu.

17.     Defendant Brad Fiscus is a Williamson County resident and member of the School Board, sued here in her individual and representative capacity. Brad.fiscus@wcs.edu

18.     Defendant Eliot Mitchell, is a Williamson County resident and member of the School Board, sued here in her individual and representative capacity.  Eliot.mitchell@wcs.edu

19.     Defendant Eric Welch, is a Williamson County resident and member of the School Board, sued here in her individual and representative capacity.  Eric.welch@wcs.edu.

20.    Defendant Rick Wimberly, is a Williamson County resident and member of the School Board, sued here in her individual and representative capacity. Rick.wemberly@wcs.edu.

21.    At all relevant times hereto, the School Board and the individual Defendants were acting under color of state law.

## JURISDICTION AND VENUE

22.    Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

23.    This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §1331, 28 U.S.C. §§1343(a)(3), (4), 28 U.S.C. §1367, 28 U.S.C. § 2201, and 42 U.S.C. §1983.

24.    There exists an actual and justiciable controversy between Plaintiffs and Defendant requiring resolution by this Court.

25.    Plaintiffs have no adequate remedy at law.

26.    Venue is proper before the United States District Court for the Middle District of Tennessee under 28 U.S.C. §1391 because all parties reside or otherwise are found herein, and all acts and omissions giving rise to Plaintiffs' claims occurred in the Middle District of Tennessee.

## FACTS

27.    Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

A.    **Williamson County Board of Education**

28.    Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

29.    The Williamson County Board of Education consists of "one member elected from each of the 12 voting districts to serve a four-year term of office. Elections were held for even numbered districts in 2018 and elections were held for odd numbered districts in 2020 and elections for even numbered districts will be held in 2022." https://www.wcs.edu/domain/1163.

5

30. The eleven individuals currently serving as Superintendent, Executive Director of Health and Safety, and School Board Members respectively are Defendants Jason A. Golden, Gary Anderson, Nancy Garrett, K.C. Haugh, Jennifer Aprea, Sheila Cleveland, Candace Emerson, Brad Fiscus, Eliot Mitchell, Eric Welch, and Rick Wimberly.

31. Defendant Jason A. Golden, Superintendent of the District, holds a juris doctor from the University of Georgia School of Law and bachelor's degrees in both mathematics and history from Vanderbilt University.

32. Defendant Gary Anderson, Executive Director of Health and Safety, previously served as the Assistant Superintendent of Administration and Support Services for Murfreesboro City Schools beginning in 2002 and also served for 30 years on the Williamson County School Board (12 of those were spent as board chairman). Mr. Anderson retired in 2020 and was then appointed to his current position by Jason A. Golden in September 2020 as the Executive Director of COVID Response.

33. Defendant Nancy Garrett, School Board Chairman, has a bachelor's degree in Business Administration from Belmont University. In 2016 Ms. Garrett was appointed to the Board to fill a vacancy and then elected in August 2018. On November 21, 2016 she signed an Oath of Office swearing to uphold the Constitution and statutes of the United States and of the State of Tennessee, and to faithfully execute the office to which she had been elected. As a member and current Chair of the School Board she swore to "place the interests of children above all others in every decision" and to "uphold all applicable federal and state laws and regulations." **See Exhibit A.**

34. Defendant K.C. Haugh, School Board Vice Chairman, has a bachelor's degree in English from the University of Wisconsin at Madison. In 2016, Mr. Haugh signed an Oath of

6

Office swearing to uphold the Constitution and statutes of the United States and of the State of Tennessee, and to faithfully execute the office to which he had been elected. As a Board Member he swore to "place the interests of children above all others in every decision" and to "uphold all applicable federal and state laws and regulations." **See Exhibit A.**

36. Defendant Jennifer Aprea has a bachelor's degrees in social science and holds a teaching credential from UC, Irvine. In September 2020, Ms. Aprea signed an Oath of Office swearing to uphold the Constitution and statutes of the United States and of the State of Tennessee, and to faithfully execute the office to which she had been elected. As a Board Member she swore to "place the interests of children above all others in every decision" and to "uphold all applicable federal and state laws and regulations." **See Exhibit A.**

36. Defendant Sheila Cleveland has been a business owner with experience in marketing and finance. In March 2017, Ms. Cleveland signed an Oath of Office swearing to uphold the Constitution and statutes of the United States and of the State of Tennessee, and to faithfully execute the office to which she had been elected. As a Board Member she swore to "place the interests of children above all others in every decision" and to "uphold all applicable federal and state laws and regulations." **See Exhibit A.**

37. Defendant Candace Emerson is a retired teacher and holds a Master of Education from Vanderbilt University. In 2014, Ms. Emerson signed an Oath of Office swearing to uphold the Constitution and statutes of the United States and of the State of Tennessee, and to faithfully execute the office to which she had been elected. As a Board Member she swore to "place the interests of children above all others in every decision" and to "uphold all applicable federal and state laws and regulations." **See Exhibit A.**

7

38.    Defendant Brad Fiscus is a retired school teacher and a graduate of Indiana University-Bloomington, receiving a Bachelor of Arts in Biology.  In 2018, Mr. Fiscus signed an Oath of Office swearing to uphold the Constitution and statutes of the United States and of the State of Tennessee, and to faithfully execute the office to which he had been elected. As a Board Member he swore to "place the interests of children above all others in every decision" and to "uphold all applicable federal and state laws and regulations." **See Exhibit A.**

39.    Defendant Eliot Mitchell has a bachelor's degree in computer science from Middle Tennessee State University. In 2016, Mr. Mitchell signed an Oath of Office swearing to uphold the Constitution and statutes of the United States and of the State of Tennessee, and to faithfully execute the office to which he had been elected. As a Board Member he swore to "place the interests of children above all others in every decision" and to "uphold all applicable federal and state laws and regulations." **See Exhibit A.**

40.    Defendant Eric Welch has a bachelor's degree in marketing from George Mason University. In 2017, Mr. Welch signed an Oath of Office swearing to uphold the Constitution and statutes of the United States and of the State of Tennessee, and to faithfully execute the office to which he had been elected. As a Board Member he swore to "place the interests of children above all others in every decision" and to "uphold all applicable federal and state laws and regulations." **See Exhibit A.**

41.    Defendant Rick Wimberly is an author and president of Galain Solutions. In 2012, Mr. Wimberly signed an Oath of Office swearing to uphold the Constitution and statutes of the United States and of the State of Tennessee, and to faithfully execute the office to which he had been elected. As a Board Member he swore to "place the interests of children above all

8

others in every decision" and to "uphold all applicable federal and state laws and regulations." **See Exhibit A.**

42. In June 2019 the School Board unanimously approved Defendant Jason A. Golden to serve as Superintendent. On June 21, 2021, the Board voted to extend his contract until June 2025.

43. As Superintendent, Mr. Golden is charged with the administration of the Williamson County Board of Education.

**Relevant Policies of the Williamson County School Board of Education**

44. Williamson County Board of Education Code Policy Manual, Section 1.000, titled "SCHOOL DISTRICT EDUCATIONAL PHILOSOPHY", provides,

> The Williamson County School Board believes that the public school system is a part of the community and, as such, **both the school and community contribute to the education of students.**
>
> We believe that education is **best achieved when students become involved in experiences meaningful to their lives**. We believe that the **educational process should develop a feeling of self-worth and accomplishment**. We should strive toward relating to the individual student's natural and acquired abilities.
>
> **We believe that equal educational opportunity is the right of all children without regard to** race, sex, creed, color, national origin, **or disability** and that **all laws to this end should be followed promptly and effectively**.
>
> **We further believe education should develop habits, attitudes, understandings, and skills necessary for a productive, satisfying life**. Each child should be helped to understand the duties and privileges of responsible citizenship as it relates to the individual and to the world community. We recognize the vast changes brought by increasing technology, population, and urbanization. **We request the advice and support of the citizens of the community** and the professional staff. We shall endeavor to provide and support educational programs appropriate to the attitudes, needs, and abilities of each student in the Williamson County School System.

9

https://onedrive.live.com/view.aspx?resid=C425CC264269ABEF!134&ithint=file%2cdocx&aut

hkey=!AH53hKHOxlQX4zM (emphasis added). See attached policy.

45.     In addition, the Board's Policy Manual "School Board Legal Status and

Authority" Section 1.100 provides,

> The Williamson County Board of Education ("the Board") is a legal body
> created by the State of Tennessee. The authority for the operation of
> Williamson County Schools by the Board is derived from the following sources:
>
> - The Legislature of Tennessee
> - State and Federal Judicial Decisions
> - Attorney General's Written Opinions
> - Rules and Regulations of the State Board of Education
> - Federal Law and Guidelines
>
> Board members have no authority over school affairs as individuals. They have
> complete authority over school affairs when they take action as a Board consistent
> with law.
>
> The Board is a **policymaking body**, legally authorized to administer that
> policy through the Superintendent of Schools.

https://onedrive.live.com/?authkey=%21AHsbqJxi0tsfSEk&cid=C425CC264269ABEF&id=C42
5CC264269ABEF%215101&parId=C425CC264269ABEF%214664&o=OneUp (emphasis
added).  See attached policy.

46.     Furthermore, for the "Role of the Board of Education" Section 1.101

.      The Board will oversee the operation of the school system **in compliance
       with state and federal laws.**

> The Board will function only when in session. The Board's required
> functions are as follows:
>
> 1. **Policy Oversight:** The Board shall develop a policy manual and
> employ a Superintendent of Schools who shall **carry out its policies
> through the development and implementation of administrative
> procedures.** The Board shall **regularly evaluate the effectiveness** of its
> policies and their implementation.

10

2. **Educational Planning:** The Board shall require reliable information which enables it and the staff to work toward the continuous improvement of the educational program. The Board shall strive to **provide the best educational opportunities possible for all students**.

\*\*\*

https://onedrive.live.com/view.aspx?resid=C425CC264269ABEF!483&ithint=file%2cdo cx&authkey=!AEGO96-uq7X-onY (emphasis added). See attached policy.

47. The "Code of Ethics for School Board Members" Section 1.2021

**Article 1 Section 1**. I will at all times think in terms of "**students first**," always determining other important things according to how they affect the education and development of students.
\*\*\*
**Article II Section 2.** I will represent at all times the entire school community and refuse to represent special interests or partisan politics.
\*\*\*
**Article IV Section 5.** I will attend all regularly scheduled Board meetings, insofar as possible, and **become informed concerning the issues to be considered at those meetings**. (emphasis added)
\*\*\*

https://tsbanet-my.sharepoint.com/:w:/g/personal/policy_tsba_net/ERJqTYcEw2lNoMbwUBQlQaoBfh W4O2wA0meajJBl6BE96w?e=8hEEvW  See attached policy.

48. The "Dress Code" Section 6.310 states
\*\*\*
Any apparel or dress that is potentially disruptive to the learning environment or educational process is not permitted. Any apparel or dress that is dangerous to the health or safety of students or the lawful, peaceful operation of the school is not permitted.
\*\*\*

https://onedrive.live.com/view.aspx?resid=C425CC264269ABEF!742&ithint=file%2cdo cx&authkey=!AGxhE94gLDgJX1U  See attached policy.

49. Moreover, the "Parent and Family Engagement" Board Policy Section 4.502 as also referenced in the WCS Bill of Rights (https://www.wcs.edu/domain/1206) states the school should be a welcoming environment that values engagement from parents and guardians.

11

https://onedrive.live.com/view.aspx?resid=C425CC264269ABEF!5991&ithint=file%2cdocx&au thkey=!AE2A26paBIJhH6M See attached policy.

50. The "Student Communicable Diseases" Policy 6.403 provides

> No student shall be denied an education solely because of a communicable disease, and his/her educational program shall be restricted only to the extent necessary to minimize the risk of transmitting the disease.

https://onedrive.live.com/view.aspx?resid=C425CC264269ABEF!774&ithint=file%2cdo cx&authkey=!APlBc2E1Thdzcvs See attached policy.

### A. WCSD's COVID-19-Based Measures

51. On July 27, 2021 TN legislature clearly communicated that school boards do NOT have the power to mandate masks, again demonstrating that the school board believes they have powers that are above the both the Governor and TN lawmakers. Exhibit B

52. For the 2020-2021 school year, masks were required however exceptions were granted to parents and students who completed opt-out forms. Gary Anderson, Executive Director of Covid Procedures shared that there was no testing done and everything was being based on CDC guidelines. See Exhibit B-2

53. The Williamson County School Board called a Special Meeting on August 10, 202, to address COVID-19 mitigation measures. The following measures were recommended by Superintendent Golden: to require masks for students, staff, and visitors at the elementary grade levels inside all buildings and buses effective Thursday August 12, 2021, to end on Tuesday, September 21, 2021. (August 10, 2021, Special Called School Board Meeting Minutes)

54. During the August 10, 2021, Special Called School Board Meeting the policy that was passed and received an affirmative vote were the following measures:

12

- Mask requirement for students, staff and visitors at the elementary grade levels inside all buildings and on buses beginning Thursday, August 12, 2021. The requirement will end on Tuesday, September 21 at 11:59 p.m.
- Teachers who are distanced six feet or more may remove their masks.
- Masks continue to be strongly recommended for middle and high school students.

The board members that voted for Defendant Superintendent Golden's measures were Defendants Eliot Mitchell, Brad Fiscus, Jennifer Aprea, Sheila Cleveland, Rick Wimberly, KC Haugh and Nancy Garrett.

55.    On August 11, 2021, Communications Director Carol Birdsong emailed the newly adopted COVID-19 measures to the Williamson County Families and Staff:

> The Williamson County Board of Education met in a special session last night and approved a temporary mask requirement for students, staff and visitors at the elementary grade levels inside all buildings and on buses beginning Thursday, August 12, 2021. The requirement will end on Tuesday, September 21 at 11:59 p.m.
>
> Teachers who are distanced six feet or more may remove their masks.
>
> Masks continue to be strongly recommended for middle and high school students.
>
> For additional information on the district's Health and Wellness Guidelines and other information, visit the Health and Wellness page of the district's website. The entire meeting can be viewed on the district's YouTube page.
>
> See attached Exhibit C

56.    The Williamson County School Board called a second Special Meeting on August 26, 2021, to address COVID-19 response strategies. Defendant Jennifer Aprea moved to extend the mask mandate to include all grades K-12. The members that voted in favor of the mask mandate included defendants Eliot Mitchell, Brad Fiscus, Jennifer Aprea, Candace Emerson, Rick Wimberly, Eric Welch, KC Haugh and Nancy Garrett.

57.    On August 27, 2021, Communications Director Carol Birdsong emailed the additional COVID-19 measures to the Williamson County Families and Staff:

The Williamson County Board of Education met in a special session last night and approved a temporary mask requirement for students, staff, and visitors at the middle and high school grade levels inside all buildings and on buses. The requirement will begin on Tuesday, August 31 and will end on Tuesday, September 21 at 11:59 p.m. The requirement is already in place at the elementary grade levels.

Teachers/staff who are distanced six feet or more may remove their masks while indoors. Teachers/staff may also remove their masks during outside activities. Any essential volunteer working directly with a student is expected to wear a mask.

As you may know, in Governor Lee's Executive Order 84, signed August 16, students may opt-out of any mask requirement made by a school district. While there is an opt-out, WCS continues to strongly recommend, encourage and advise masking for all students, staff, and visitors while inside a WCS school, WCS facility and the Central Office.

COVID-19 mitigation strategies continue to evolve and those can be found, along with other information including the mask opt-out form, on the district's website. The entire meeting can be viewed on WC-TV's YouTube channel.

Your school principal will share information specific to your school.

See attached Exhibit I

58. A regularly scheduled School Board meeting was held on September 21, 2021 in which all board members were in attendance. September 21 marks the day the previous mask mandate was set to expire or be revisited.

59. During public commentary, it was stated that the lack of mitigation efforts and continued infringement of parents and student's medical freedom and continued mandates would be met with litigation.

60. During the Board discussion of the School Board meeting, a motion was raised to extend the current mask mandate through January 9, 2022. The motion was made by defendant Eric Welch and seconded by defendant KC Haugh. The motion passed with a vote of 8-4. The board members voting in favor of the mask mandate included Defendants Eliot Mitchell, Jennifer Aprea, Rick Wimberly. Candy Emerson, Eric Welch, K.C. Hough and Nancy Garrett.

14

Garrett. It is worth noting Brad Fiscus also voted to extend the mandate, but his resignation is effective at the end of September, so we are declining to include him in this complaint. See Exhibit I

61. A motion was made to remove religious exemptions relative to the mask mandate. There was discussion and several board members raised concerns about this infringing on people's rights and how much control the board has over the community and individuals. Ultimately the motion failed but there were four "yes" votes by Eliot Mitchell, Brad Fiscus and KC Haugh,

### B. General Allegations: The Science of Universal Masking

62. U.S. Centers for Disease Control (CDC) statistics show that COVID-19 is not much of threat to schoolchildren. The studies' data shows that more people under the age of 18 died of influenza during the 2018-19[1] flu season – a season labeled "moderate severity" that lasted eight months – than have died of COVID-19 across more than 18 months.[2]

1 https://www.cdc.gov/flu/about/burden/2018-2019.html
2 https://www.cdc.gov/nchs/nvss/vsrr/COVID-19_weekly/index.html

63. The ineffectiveness of masks was well known before 2020, as stated in a New England Journal of Medicine perspective from May 2020: "We know that wearing a mask outside health care facilities offers little, if any, protection form infection. In many cases, the desire for widespread masking is a reflexive reaction to anxiety over the pandemic."

64. Harms for mask wear for children is an increasing concern. While children are at very low risk of infection and tend to spread the virus at a much lower rate, masks have become common for school openings. A large study in Germany

15

among over 25,000 children reported impairments such as headache in over 50%, fatigue (37%), difficulty concentrating (50%), and irritability (60%) among others. A second study documents both the risks for children form COVID-19 and a substantial number of harms from mask wear.

65.     All parties mandating the use of facemasks are not only willfully ignoring established science but are engaging in what amounts to a whole school clinical experimental trial. This conclusion is reached by the fact that facemask use, and COVID-19 incidence, are being reported in scientific opinion pieces promoted by the CDC and others.[2] The fact is after reviewing ALL the studies worldwide, the CDC found "no reduction in viral transmission with the use of face masks."[3]

3 Nonpharmaceutical Measures for Pandemic Influenza in Nonhealthcare Settings—Personal Protective and Environmental Measures, Jingyi Xiao1, Eunice Y. C. Shiu1, Huizhi Gao, Jessica Y. Wong, Min W. Fong, Sukhyun Ryu, and Benjamin J. Cowling (Volume 26, Number 5, May of 2020).

school board, resulting in health issues, fear, and discrimination in our schools without any science that they are effective in controlling the spread of COVID-19. The mere fact that we are approaching two years validates masks are not effective. The health of our children is the parent's responsibility however the school board believes they can decide what's best for our child despite the fact they do not, in fact, have the legal authority to do so.

67.     A group of parents in Gainesville, FL, concerned about potential harms from masks, submitted six face masks to a lab for analysis. The resulting report found that five masks were contaminated with bacteria, parasites, and fungi, including three with dangerous pathogenic and pneumonia-causing bacteria. No viruses were detected on the masks, although the test can detect viruses. The analysis detected 11 alarmingly dangerous pathogens on the masks.

https://townhall.com/tipsheet/scottmorefield/2021/06/15/a-group-of-parents-sent-their-kids-face-masks-to-a-lab-for-analysis-heres-what-they-found-n2591047/

### C. Incidents and impact of mask mandate on Plaintiffs

68.  General discomfort:  Plaintiff B.H. complained of headaches and pimples from wearing the mask all day during the 2020-2021 school year.  This concerned Plaintiff Connie Keffaber because B.H. takes prescribed medication, and worried if the oxygen deprivation caused the headaches or was it negatively impacting the efficacy of her medication. When Connie Keffaber suggested that B.H. just let her nose out occasionally to breathe, B.H. responded "No way, we can't do that -- We get sent to the office if our nose is out of our mask!"  Our kids are being controlled by fear of consequence for the slightest noncompliance.

69.  Illness festering:  B.H. developed a sinus infection during the last week of January 2021 which was of course under mask mandate.  B.H. had facial sinus and ear pain, and congestion.  Connie Keffaber believes B.H. acquired this (non-contagious) illness from inhaling $CO_2$, and bacteria stuck in her mask all day long.  B.H. remained home from school one day, because removing her mask to blow her nose was not permitted.  B.H. used Afrin nasal spray to avoid the nose blowing at school but suffered a reaction – painful burns in her nose and loss of smell.  When this resolved the first week in February, B.H. mistakenly commented at the lunch table that she was happy to finally smell her food again.  Security officers were notified, and they promptly removed her from the cafeteria and brought her to the office.  B.H. called Connie Keffaber very upset with a trembling voice, telling me what happened, and I would be getting a phone call.  The school nurse then called and told me she was not allowed to

17

say such things as it causes alarm. I explained that she already had Covid, and she just recovered from a sinus infection.

70. Plaintiffs L.M. and P.M. were unenrolled from Williamson County during the 2020-2021 school year due to concerns over masks and quarantines and the negative impact of both. After re-enrolling P.M. and L.M. and their returning to in person classes in the fall of 2021, plaintiff K. McKinney informed the school that her children would not wear masks. (Exhibit D) K. McKinney has been outspoken with the school and in the local community about the detriments of masking and the fundamental rights of parents to make medical and other decisions for their children.

71. Plaintiff T.B. attends school in Williamson County and had a mask opt out through the 2020-2021 school year. With the opt out, T.B. was forced to wear a lariat identifying as such, which singled him out and subjected him to all manner of comments from peers and teachers. In 2021, Plaintiff S.Blount has been outspoken on behalf of T.B. and all students about the detriments of masking and the fundamental rights of parents to make medical and other decisions for their children. S. Blount has spoken with numerous members of WCS and has received no support. Students were harmed during the lockdown mentally, physically, and educationally. Masking youth with 99.99% percent chance of a 100% recovery from a virus does irreparable damage and it cannot be calculated until later in their development. It is child abuse.

72. Plaintiffs J.H. and M.H. were kept at home for the 2020-2021 school year due to mask mandates. M.H. was unenrolled due to concerns over the impact of quarantines and the school district's lack of experience in virtual education. J.H. remained in Williamson County School's but participated in the online program as he

has intellectual and development disabilities and is unable to wear a mask for medical and psychological reasons. J.H. also has speech delays that make mask wearing a problem for his intelligibility. During Individualized Education Plan ("IEP") meetings in the fall of 2020, these concerns were shared with teachers and administrators at Sunset Middle School. M.H. has asthma and anxiety and the stress of being in and out of school due to quarantines and fear of the impact of masks made it impossible to keep her in school in person. Both J.H. and M.H. spent an entire school year with no social interaction and missed out on the normal childhood experience of entering high school and middle school, respectively. They were isolated from peers and suffered unfortunate effects of such.

73.     With plaintiffs J.H. and M.H. attending school in person for the 2021-2022 school year, on August 2,2021, plaintiff Megan Heim contacted Jennifer Aprea, district board representative, and Superintendent Jason Golden in advance of a scheduled board meeting to express concern with masking and potential mandates. Jennifer Aprea replied that "if your son has medical reasons not to wear a mask, those accommodations should be made." Exhibit E

74.     In advance of the Williamson County School Board meeting on August 10, 2021, Plaintiff Megan Heim sent a detailed letter regarding mask concerns to all WCS board members, Superintendent Jason Golden and the principals of J.H. and M.H.'s schools urging them to continue to allow families the right to choose whether to mask their children. Citing concerns with psychological and physical health relative to mask wearing, research and additional information were provided to demonstrate both the lack of authority of the WCS Board to mandate masks and data demonstrating the significant negative effects of long-term mask use.

19

This communication asserted that plaintiffs M.H. and J.H. do not consent to being forced to wear a mask and insisting they not be treated differently; it also urged the board to comply with State and Federal-law and "advise children they have a right to refuse or wear a mask." Exhibit E

75.    Early in the school year, plaintiff J.H. was forced to quarantine for a stuffy nose, denying him both social interaction and educational time. After sending notice to school on August 18, 2021, that J.H. was staying home out of an "abundance of caution for a slight stuffy nose", notice was sent by Sunset Middle School (Exhibit F) that he could only return to school with 1. written documentation from an HCP/Health Department with a return to school date listed or, 2. A negative COVID-19 test and no fever or other symptoms for 24 hours (must provide proof of negative test) or 3. Stay home for 10 days from symptom onset. The first problem is that this goes against the district's illness guidelines which were attached to that message (Exhibit G) and it penalizes students by forcing them to miss school. After three days at home, J.H.'s teacher coordinated work and we got a Chromebook for him to join virtually from home. This was not done proactively, and we learned a week later that J.H. was given unexcused absences for days he was not able to join virtually. With both parents of J.H. working full time, it was unreasonable to expect us to be available with no notice to oversee schoolwork.

76.    Following the August 26 Specially Called School Board Meeting, communication was sent on August 27 from the school regarding the approved temporary mask requirement that was expanded from grades K-5 to include all middle and high school students.

**D. Plaintiffs Place Defendants on Notice of Lawsuit.**

77. In reply to the school announcing the expanded mask requirements, plaintiff Megan Heim again contacted the full school board, principals, and Superintendent reiterating that plaintiffs M.H. And J.H. would not comply with mask mandates and additionally urging the district to address whether the air quality in school is safe. A letter was attached (Exhibit H) outlining concerns that the mask mandates inferred that the school air quality is dangerous to students' health, and that the actual science would be to conduct an air quality test. Both State and federal statutes were shared regarding use of individual respiratory equipment (Exhibit H) and what procedures are described and required by the law. Plaintiff Megan Heim urged the board to investigate the schools' air quality by bringing in an Environmental Toxicologist/Industrial Hygienist. This communication was documented as read by several defendants and acknowledged by both Principals. Exhibit H

78. Williamson County School Board and Superintendent Jason Golden have shown a blatant disregard for an overwhelming majority of parents who have rallied and spoken out to the school board for freedom of choice on mask mandates. Parents' opinions are not being considered AT ALL, and it is evident that these decisions are being made well before people walk into the room. The school board is not making decisions based on what We, the Parents (the taxpayers) want for our children. It has been stated to the board during public comment in board meetings that if they continue to mandate masks and impede Tennesseans Constitutional rights, they will face litigation. We will not co- parent with the school or the government.

**E. The Masking Requirement Causes Immediate and Irreparable Harm to Students, Staff, and Community.**

79. In his Affidavit, attached hereto as **Exhibit J**, Stephen E. Petty, an expert in the field of Industrial Hygiene who has testified as to the futility and danger caused by an

21

individual wearing a mask in order to avoid transmitting or becoming infected with Covid-19, states the following:

***

1. I hold relevant industry certifications including board certifications as a C.I.H. (Certified Industrial Hygienist), a C.S.P. (Certified Safety Professional), and as a P.E. (Professional Engineer) in six states (Florida, Kentucky, Ohio, Pennsylvania, Texas and West Virginia). My curriculum is attached hereto as **Exhibit i**.

2. I have served as an expert in personal protective equipment and related disciplines in approximately 400 legal cases. I have often been certified as, and provided testimony as, an expert in these areas. My list of representative cases is attached hereto as **Exhibit ii**.

3. For example, I am currently serving as an expert in the Monsanto Roundup and 3-M PFAS litigation. Recently I testified in four trials for the DuPont C-8 litigation.

4. I taught Environmental and Earth Sciences as an adjunct professor at Franklin University.

5. I hold nine U.S. patents, most related to heating, ventilation and air conditioning (HVAC) systems.

6. I am a current member in good standing of the following relevant associations: American Industrial Hygiene Association (AIHA), American Board of Industrial Hygiene (ABIH), American Conference of Governmental Ind. Hygienists (ACGIH), American Institute of Chemical Engineers (AIChE), American Society of Refrigeration, Air Conditioning and Refrigeration Engineers (ASHRAE); Member ASHRAE 40 Std. and TC 2.3, and Sigma Xi.

7. I am an expert in the field of Industrial Hygiene, which is the science and art devoted to the anticipation, recognition, evaluation, and control of those environmental factors or stressors — including viruses — arising in or from the workplace, which may cause sickness, impaired health and well-being, or significant discomfort among workers or among the citizens of the community.

8. Industrial Hygiene is fundamentally concerned the proper methods of mitigating airborne/dermal hazards and pathogens, as well as with the

22

design and use of engineering controls, administrative controls and personal protective equipment, among other things.

9. Medical doctors, virologists, immunologists, and many public health professionals are not qualified experts in these areas by virtue of those aforementioned credentials.

10. On May 7, 2021, the Centers for Disease Control (CDC) updated its guidance, providing that the primary mechanism for transmission of Covid-19 is through airborne aerosols, and not, as previously stated, by touching contaminated surfaces or through large respiratory droplets, as also stated during previous periods of the pandemic.

11. Airborne viral aerosols can consist of a single viral particle or multiple viral particles clumped together, and usually smaller than 5 μ (microns) in size. By comparison, droplets are >5 μ to >10 μ in size.

12. A square micron is approximately 1/4000th the area of the cross-section of a human hair and 1/88th the diameter of a human hair. Covid particles are —1/10 of a micron or —1/40,000th the area of a cross section of a human hair or —1/1,000th the diameter of a human hair.

13. A recent University of Florida study capturing air samples within an enclosed automobile cabin occupied by a Covid-positive individual showed that the only culturable Covid-19 virus samples obtained were between 0.25μ to 0.5μ in size. Particles smaller than 5μ are considered very small and/or very fine or aerosols.

14. Very small particles do not fall by gravity in the same rate that larger particles do and can stay suspended in still air for a long time, even days to weeks.

15. Because they stay suspended in concentration in indoor air, very small particles can potentially accumulate and become more concentrated over time indoors if the ventilation is poor.

16. Very small airborne aerosols pose a particularly great risk of exposure and infection because, since they are so small, they easily reach deep into the lung. This explains in part why Covid-19 is so easily spread, and why so little Covid-19 is required for infection.

17. Exposure to airborne aerosols is a function of two primary parameters: concentration and time. Less is better regarding both parameters.

18. For many reasons, personal protective equipment (PPE) is the <u>least</u> desirable way to protect people from very small airborne aerosols. Moreover, masks are not PPE since they cannot be sealed and do not meet the provisions of the Occupational Safety and Health Administration (OSHA) Respiratory Protection Standard (RPS), namely 29 CFR 1910.134.

19. Regarding PPE, facial coverings do not effectively protect individuals from exposure to very small airborne aerosols. A device referred to as a respirator is required to provide such protection.

20. The AIHA, in their September 9, 202,0 Guidance Document for COVID-19 (**Exhibit iii**) noted that the acceptable relative risk reduction methods must be $\geq$90%; mask were shown to be only 10% and 5% (see Exhibit iii - Figure 2) and far below the required 90% level.

21. Similarly, Shah, et al, 2021, (**Exhibit iv**), using ideally sealed masks and particles 1 micron in size, reported efficiencies for the more commonly used cloth masks and surgical masks of 10% and 12% respectively. No mask can be perfectly sealed, thus "real world" effectiveness would be even lower.

22. Industrial hygienists refer to a "Hierarchy of Controls" that are typically implemented to minimize exposures, including exposures to very small airborne aerosols like Covid-19.

23. Regarding practical or "engineering" controls, industrial hygienists focus on practices that dilute, destroy, or contain airborne hazards (or hazards in general).

24. PPE — especially facial coverings — do not dilute, destroy, or contain airborne hazards. Therefore, facial coverings do not appear anywhere in the Industrial Hygiene (IH) Hierarchy of Controls for very small airborne aerosols like Covid-19. Even respirators (part of the PPE Category and not masks) are in the last priority on the Hierarchy of Controls.

25. Facial coverings are not comparable to respirators. Leakage occurs around the edges of ordinary facial coverings. Thus, ordinary facial coverings <u>do not</u> provide a reliable level of protection against inhalation of very small airborne particles and are not considered respiratory protection.

26. For example, during the seasonal forest fires in the summer of 2020, the CDC issued public guidance warning that facial coverings provide no protection against smoke inhalation. That is because facial coverings do not provide a reliable level of protection against the small particles of ash

contained in smoke. Ash particles are substantially larger than Covid-19 aerosolized particles.

27. Ordinary facial coverings like the ones required by WCS facial covering policy do not meet any of the several key OSHA Respiratory Protection Standards for respirators.

28. Because of the gaps around the edges of facial coverings required by WCS's policy, they do not filter out Covid-19 aerosols. The policy stating masks will be worn without gaps defies known science that masks worn today cannot be sealed and always have gaps.

29. The effectiveness of a cloth facial covering falls to zero when there is a 3% or more open area in the edges around the sides of the facial covering.

30. Most over-the-counter disposable facial coverings have edge gaps of 10% or more. When adult-sized facial coverings are used by children, edge gaps will usually greatly exceed 10%.

31. Even short breaks (e.g. to eat) expose individuals to Covid-19 aerosols in indoor spaces.

32. Ordinary cloth facial coverings like the ones required by the MCSD mask requirement do not provide any filtering benefit relative to particles smaller than 5μ if not sealed.

33. Substantial mitigation of Covid-19 particles could be immediately achieved by:

    a.  opening windows and using fans to draw outdoor air into indoor spaces (diluting the concentration of aerosols),

    b.  setting fresh air dampers to maximum opening on HVAC systems,

    c.  overriding HVAC energy controls,

    d.  increasing the number of times indoor air is recycled,

    e.  installing needlepoint ionization technology to HVAC intake fans, and

    f.  installing inexpensive ultraviolet germicide devices into HVAC systems.

35. All of the above-referenced techniques are more effective and meet standard industrial hygiene hierarchy of controls (practices) for controlling

25

exposures in place for nearly 100 years. The use of cloth facial coverings do not fit within these basic hierarchy of controls since masks are not PPE and cannot be sealed. There are no OSHA standards for facial coverings (masks) as respiratory protection.

36.     Extended use of respiratory PPE is not indicated without medical supervision.

37.     As explained in an article titled "Is a Mask That Covers the Mouth and Nose Free from Undesirable Side Effects in Everyday Use and Free of Potential Hazards?" that was published on April 20, 201, in the *International Journal of Environmental Research and Public Health* and that is attached to this Affidavit as **Exhibit iv**, the following negative effects from wearing masks was reported in the literature:

| Increased risk of adverse effects when using masks: | | |
|---|---|---|
| **Internal diseases** | **Psychiatric Illness** | **Neurological Diseases** |
| COPD | Claustrophobia | Migraines and Headache Sufferers |
| Sleep Apnea Syndrome | Panic Disorder | Patients with intracranial Masses |
| advanced renal Failure | Personality Disorders | Epilepsy |
| Obesity | Dementia | |
| Cardiopulmonary Dysfunction | Schizophrenia | |
| Asthma | helpless Patients | |
| | fixed and sedated Patients | |
| **Pediatric Diseases** | **ENT Diseases** | **Occupational Health Restrictions** |
| Asthma | Vocal Cord Disorders | moderate / heavy physical Work |
| Respiratory diseases | Rhinitis and obstructive Diseases | |
| Cardiopulmonary Diseases | | **Gynecological restrictions** |
| Neuromuscular Diseases | **Dermatological Diseases** | Pregnant Women |
| Epilepsy | Acne | |
| | Atopic | |

**Figure 5.** Diseases/predispositions with significant risks, according to the literature found, when using masks. Indications for weighing up medical mask exemption certificates.

Example statements made in the paper include the following: "The overall possible resulting measurable drop in oxygen saturation (O2) of the blood on the one hand and the increase in carbon dioxide (CO2) on the other contribute to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase, in some cases also to a significant blood pressure increase." Exhibit iv, p. 25. In fact, "Neither higher level institutions such as the WHO or the European Centre for Disease Prevention and Control (ECDC) nor national ones, such as the Centers for Disease Control and Prevention, GA, USA (CDC) or the German RKI, substantiate with sound scientific data a positive effect of masks in the public (in terms of a reduced rate of spread of COVID-19 in the population)." Exhibit iv, p. 24. For these reasons, students who are required to wear masks pursuant to a mandate suffer immediate and irreparable injury, loss, or damage.

26

38.  In summary:

    a.  PPE is the least desirable way to protect people from very small airborne aerosols.

    b.  Facial coverings as required by school policy are not recognized as PPE since they cannot be sealed and are not covered by the OSHA RPS.

    c.  If PPE were to be used for protection, respirators, not facial coverings as required by the school policy are needed to provide any effective protection from very small airborne aerosols.

    d.  Very small aerosol particles are more likely to be a greater cause of disease than respiratory droplets because they can evade PPE and reach deep into the lungs, whereas respiratory droplets have to work against gravity in order to travel up a person's nose into the sinus.

    e.  Much better alternatives to controlling exposure are available (i.e., engineering controls of dilution – ventilation with increased fresh air and destruction), and should be used to minimize exposures as opposed to masks.

    f.  Individuals who are required to wear masks pursuant to a mandate suffer immediate and irreparable injury, loss, and damage due to the overall possible resulting measurable drop in oxygen saturation of the blood on one hand and the increase in carbon dioxide on the other, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

80.  Plaintiffs note that the state of Tennessee was given more than $2,000,000,000 pursuant to the American Rescue Plan ("ARP") Act of 2021 by agreeing to implement the federal guidelines set forth by the CDC for COVID-19 mitigation efforts. See the attached letter from the U.S. Secretary of Education, attached hereto as **Exhibit P**. See also, https://oese.ed.gov/files/2021/07/Ohio-ARPESSER-State-Plan-Highlights-v2-071421.pdf. The

27

letter links to the CDC guidelines available at https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/operationstrategy.html. The guidelines suggest that a school board would forfeit ARP allocations by making masks optional, and states that have prohibited mask mandates in schools have received letter notifying them that they will not receive ARP funds. Accordingly, it seems Defendants have a financial incentive for implementing the mask mandate, despite that such a requirement serves no scientific purpose and subjects individuals who wear masks to the health risks discussed above.

81. Plaintiff Megan Heim, in her own capacity and on behalf of her minor children, J.H. and M.H., Plaintiff Kristin McKinney;, in her own capacity and on behalf of her minor children, L.M. and P.M., Plaintiff Sharon Blount in her own capacity and on behalf of her minor child T.B. and Connie Keffaber in her own capacity and on behalf of her minor child B.H. are aggrieved by the immediate and irreparable injury, loss, and damage suffered by J.H., M.H., L.M., P.M., T.B. and B.H because J.H., M.H., L.M., P.M., T.B. and B.H are required to wear a mask pursuant to the School Board's mask mandate, which is not only unsupported by science, but which also results in the possible  measurable drop in oxygen saturation of the blood on one hand and the increase in carbon dioxide on the other, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

### COUNT I - 42 U.S.C. §1983 - Violation of Procedural Due Process (5th and 14th Amendments) Against All Defendants

82. Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

83. In order establish a claim under section 1983 of the Civil Rights Act, a plaintiff must prove a Defendant: (a) acted under the color of state law; (b) proximately causing; (c) the Plaintiff to be deprived of a federally protected right. 42 U.S.C. §1983.

28

84. In the instant case, Defendants unquestionably acted under the color of state law.

85. Each Individual Defendant is an elected, voting member of the Williamson County Board of Education with the exception of Defendant Jason A. Golden, who is the Superintendent of the Williamson County School District.

86. Under the Fifth Amendment to the Constitution, no person may be deprived of life, liberty, or property without due process of law. U.S. Const. Ann., Amendment V.

87. The Fourteenth applies the protections of the Fifth Amendment to state actors. U.S. Const. Ann., Amendment XIV.

88. Plaintiffs have constitutionally protected interests in the benefits that come from not being subject to the Board's mask mandate, including the ability to pursue an education without being subjected to health risks that are not offset by any scientifically provable benefits.

89. Defendants' implementation of the mask policy unlawfully deprives Plaintiffs of these and other constitutionally protected interests without due process of law. Such deprivation occurred with no notice or meaningful opportunity to be heard as the Superintendent instated the mask mandate prior to offering an opportunity for public discussion. Such deprivation was arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the School Board's own policies and other applicable laws. Such deprivation violates the Fifth and Fourteenth Amendments of the Unites States Constitution.

90. Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress

29

response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

## COUNT II - 42 U.S.C. §1983 - Violation of Substantive Due Process
### (Fourteenth Amendment) – Against All Defendants

91.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

92.     In order establish a claim under section 1983 of the Civil Rights Act, a plaintiff must prove a Defendant: (a) acted under the color of state law; (b) proximately causing; (c) the Plaintiff to be deprived of a federally protected right. 42 U.S.C. §1983.

93.     In the instant case, Defendants unquestionably acted under the color of state law.

94.     Each individual Defendant is an elected, voting member of the Williamson County Board of Education with the exception of Defendant Jason A. Golden, who is the Superintendent of the Williamson County School District.

95.     Under the Fourteenth Amendment to the Constitution, and as established by state law including the state created danger doctrine, Plaintiffs have a fundamental right to a public education and to an education in a safe and healthy environment.

96.     Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

## COUNT   III   -   Violation   of   Procedural   Due   Process
### (TN Const. Art. I, § 17) Against All Defendants

97.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

98.     Article 1, § 17 of the Constitution of the State of Tennessee provides, "All courts shall be open; and every man, for an injury done him in his lands, goods, person or reputation,

shall have remedy by due course of law, and right and justice administered without sale, denial, or delay. Suits may be brought against the state in such manner and in such courts as the Legislature may by law direct."

99. Article 1, § 17 of the Constitution of the State of Tennessee affords the people of Tennessee with the right to be free from violations of the procedural due process rights, and no person may be deprived of life, liberty, or property without due process of law.

100. Plaintiffs have constitutionally protected interests in the benefits that come from not being subject to the Board's mask mandate, including the ability to pursue an education without being subjected to health risks that are not offset by any scientifically provable benefits. Defendants' implementation of the mask policy unlawfully deprives Plaintiffs of these and other constitutionally protected interests without due process of law. Such deprivation occurred with little notice or meaningful opportunity to be heard as the Superintendent called a special meeting and recommended the mask mandate prior to offering an opportunity for public discussion to be able to present the science from an expert. Such deprivation was arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the School Board's own policies and other applicable laws. Such deprivation violates Article 1, § 17 of the Constitution of the State of Tennessee.

101. Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

## RESERVATION OF RIGHTS

Plaintiffs herein expressly reserve their rights in regards to any additional claims to which they may be entitled under federal law as well as under the laws of the State of Tennessee, including claims arising from any violations of Tennessee's Open Meetings Laws or other actions of misconduct that may have been committed by Defendants. Plaintiffs expressly place Defendants on notice of Plaintiffs' intention to initiate removal proceedings at the state court level against Defendants as a result of the infractions Defendants have committed, as described herein.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

a.   Assume jurisdiction of this action;

b.   Vacate and set aside the Defendants' mask mandate as well as any other action taken by Defendants to institute the mask mandate and implement the provisions of the mask policy;

c.   Declare that the Defendants' masking policy is unconstitutional, void and without legal force or effect.

d.   Declare that the institution of the mask policy and actions taken by Defendants to implement the mask policy are arbitrary, capricious, based on ignorance due to failure to inquire into facts, otherwise not in accordance with law, and without observance of required procedures.

32

e. Declare that the mask policy and the actions taken by Defendants to implement the mask policy are in violation of the Constitution and contrary to the laws of the United States and the State of Tennessee;

f. Temporarily restrain, as well as preliminarily and permanently enjoin Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from implementing or enforcing the mask policy and from taking any other action to implement the masking policy that is not in compliance with applicable law; and

g. Award Plaintiffs their reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988; and grant such other and further relief as may be just, equitable and proper.

## CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

33

Respectfully submitted this 21st day of September, 2021.

Signature of Plaintiff: _____ Date: 9/21/21

Megan Heim
2044 Clifton Johnston Court
Nolensville, TN
615-854-1506 (Telephone)
meganheim@pm.me
Megan Heim, Individually and on behalf of her
minor children J.H. and M.H.

Signature of Plaintiff: _____ Date: 9/21/21

Kristin McKinney
8237 Middlewick Lane
Nolensville, TN 37135
615.495.2818 (Telephone)
benton.kristin@gmail.com
Kristin McKinney, Individually and on behalf
of her minor children L.M. and P.M.

Signature of Plaintiff: _____ Date: 9/21/21

Sharon Blount
3557 Creamery Bridge Rd.
Thompsons Station, TN
37279Williamson County
601-968-2688 (Telephone)
sharonblount@me.com
Sharon Blount, Individually and on behalf of
her minor child T.B.

Signature of Plaintiff: _____ Date: 9/21/21

Connie Keffaber
2454 Durham Manor Dr.
Franklin, TN 37064
908 319 3862  (Telephone)
Connie5691@hotmail.com
Connie Keffaber, Individually and on behalf of
her minor child B.H.

34